80 P.3d 1077

Anna OXLEY, Claimant,

v.

**MEDICINE ROCK SPECIALTIES, INC., Employer–Appellant,**

and

**State of Idaho, Department of Labor, Respondent.**

No. 29446.

Supreme Court of Idaho, Pocatello, September 2003 Term.

Nov. 24, 2003.

in Mackay, Idaho. The business manufactures nightlights and decorative items out of cut and painted rock. Claimant Anna Oxley (Oxley) began work at Medicine Rock in September 1999. In August 2001, Len Mazon (Mazon) purchased the business and retained Oxley as an employee. At that time, only Oxley could run the pad printer, which made her continued employment vital. Mazon, new to manufacturing, relied on Oxley to train him.

Shortly after purchasing Medicine Rock, Mazon experienced difficulties with Oxley. According to Mazon, one employee quit, citing prolonged verbal abuse from Oxley. Another employee threatened to quit, but Mazon persuaded the employee to stay. A third employee complained Oxley yelled at coworkers and treated them as though they were stupid. Mrs. Mazon found Oxley's behavior controlling and demeaning. Employees constantly complained Oxley behaved in a negative and caustic manner. Oxley frequently disparaged Mazon's business decisions in the community and encouraged one employee to find another job. Oxley also demanded a raise, implying she would otherwise quit.

Oxley denies she disparaged Mazon in the community, that she implied she would quit without a raise, that she ridiculed and yelled at other employees, or that she encouraged an employee to find another job. Oxley maintains she worked alone on the pad printer, but trained employees as Mazon requested.

Despite the complaints, Mazon did not meet formally with Oxley to discuss her behavior because of his busy work schedule and out of fear she would quit, leaving Medicine Rock without a trained employee. Mazon only made casual comments about being kind and following the golden rule. However, Mazon asserts he desired to terminate Oxley's employment but chose to wait until another trained employee became available.

Employees frequently purchased products from Medicine Rock by earmarking inventory and then paying later. The employees noted payments in an inventory ledger. In

J. Michael Wheiler, Idaho Falls, for appellant.

Hon. Lawrence G. Wasden, Attorney General, Boise, for respondent.

TROUT, Chief Justice.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Medicine Rock Specialties, Inc., (Medicine Rock) is a small gift manufacturing business

January and February of 2002, Mazon was told by two employees that Oxley had earmarked inventory and removed the items without paying. According to the employees, Oxley took the items for her sister, commenting the items were "employee benefits" for which she did not have to pay. The employees claim they never saw the products returned to inventory.

Mazon did not investigate the accusations until May 2002. Mazon checked the inventory ledger and discovered no entries indicating Oxley paid for any items. On May 20, 2002, Mazon formally confronted Oxley with the theft accusations, which Oxley denied but offered no explanation and claimed she felt insulted. Later, Oxley claimed that she had taken some items to Jackpot, Nevada, without telling Mazon, to show a buyer. Oxley insists she returned the items and they were subsequently shipped out.

From June 3 through June 5, 2002, Oxley failed to log her production as required. Oxley maintained that Mrs. Mazon did not prepare a log calendar, but also claimed she logged her production on a memo pad and did not give anyone the log because Mrs. Mazon did not require or request her to do so.

On June 6, 2002, Mazon asked Oxley to apply polymer rather than operate the pad printer, her usual task, so a new employee could practice running the pad printer. Oxley refused the assignment. Mazon then asked Oxley to take over touch up painting; both tasks which Mazon believed Oxley had previously performed. Oxley told Mazon her hands shook too badly to perform touch up painting, although she had never mentioned this problem before.[1] Mazon then asked Oxley to paint binding agent on rocks. Mazon claims Oxley accepted the task and performed without a shaking hand, but did a poor job.

At the close of business, Mazon met formally with Oxley. Oxley demanded that Mazon give her the next day, Friday, June 7, off. Mazon gave Oxley the day off and told Oxley he expected her to work Monday, June 10, and Tuesday, June 11. Mazon also approved Oxley's requested vacation time from June 12 through July 2. Oxley agreed she would work June 10 and June 11. Mazon then advised Oxley that her behavior during the shift was unacceptable, that she must perform assigned tasks, and that running the pad printer was not her only duty and she must perform a variety of tasks. Mazon asked Oxley to sign a memo agreeing he had informed her of her duties and advised her of an acceptable level of behavior. According to Mazon, Oxley loudly announced she would not sign and left the office. Oxley claims she felt insulted and demeaned and claims Mazon read the memo aloud in such a manner that another employee overheard.

The following day, June 7, Oxley went to a physician and obtained a note releasing her from work. The doctor did not indicate a specific medical condition, but Oxley wrote on the release that her eyes burned due to the previous day's work. Oxley did not mention to anyone her eyes burned on June 6.

Oxley did not report for work on June 10. Instead, she faxed Mazon a copy of the doctor's note at three o'clock in the afternoon. The same afternoon, Mazon sent Oxley a second written warning about her unacceptable job performance the previous week. Mazon listed the same instances of misconduct he discussed with Oxley on June 6. The letter did not mention Oxley's failure to come to work. Oxley left town on vacation June 11.

During Oxley's vacation, Mazon completed his investigation into the theft allegations by obtaining a statement from the accusing employees, and concluded Oxley had stolen inventory. Mazon decided to discharge Oxley and sent her a termination letter on June 20,

---

1. It is unclear why Oxley refused the tasks. Mazon claims Oxley said she did not know how to apply polymer and that her hand shook too badly to perform touch up painting. The Examiner's report indicates Oxley told Mazon that she did not know how to perform either task, but did not mention a hand tremor to the Examiner. Oxley claims that the previous owner determined she should not do either task because her hands shook and therefore Oxley was never trained or performed the tasks. Oxley claims the tremor began in March 2002, but she did not see a doctor. This is inconsistent with Oxley's claim that her hands shook in 1999 when she worked for the previous owner.

2002. The letter noted the same instances of misconduct as the *June 6* and *June 10* notifications and, in addition, Mazon cited stealing inventory as a reason for discharge. Oxley received the June 10 warning and the termination letter when she returned from vacation in July.

Oxley applied for unemployment benefits July 12, 2002. On July 30, 2002, the Idaho Department of Labor (IDL) granted Oxley unemployment benefits. Medicine Rock filed a protest and an Appeals Examiner scheduled a hearing. At the hearing both parties called witnesses and presented evidence. The Examiner concluded Mazon terminated Oxley for "other than employment related misconduct," making Oxley eligible for unemployment benefits under Idaho Code § 72–1366(5).

Medicine Rock appealed the Examiner's decision to the Industrial Commission (Commission). The Commission reviewed the record *de novo* and issued a Decision and Order affirming the Examiner's decision. Medicine Rock moved for reconsideration and the Commission denied the motion. Medicine Rock appeals.

## II. STANDARD OF REVIEW

■ When this Court reviews a Commission decision, it exercises free review over questions of law, but reviews questions of fact only to determine whether substantial and competent evidence supports the Commission's findings. *Hughen v. Highland Estates,* 137 Idaho 349, 350, 48 P.3d 1238, 1240 (2002) (citing *Ogden v. Thompson,* 128 Idaho 87, 88, 910 P.2d 759, 760 (1996)). Substantial and competent evidence is "relevant evidence which a reasonable mind might accept to support a conclusion." *Folks v. Moscow School Dist. No. 281,* 129 Idaho 833, 836, 933 P.2d 642, 645 (1997) (citing *Laundry v. Franciscan Health Care Ctr.,* 125 Idaho 279, 282, 869 P.2d 1374, 1377 (1994)); *Boise Orthopedic Clinic v. Idaho State Ins. Fund,* 128 Idaho 161, 164, 911 P.2d 754, 757 (1996). The Commission's conclusions regarding the credibility and weight of evidence will not be disturbed unless the conclusions are clearly erroneous. *Zapata v. J.R. Simplot Co.,* 132 Idaho 513, 515, 975 P.2d 1178, 1180 (1999).

Finally, in reviewing a decision of the Commission, this Court "views all the facts and inferences in the light most favorable to the party who prevailed before the Commission." *Boley v. State,* 130 Idaho 278, 280, 939 P.2d 854, 856 (1997) (citing *Smith v. J.B. Parson Co.,* 127 Idaho 937, 908 P.2d 1244 (1996)).

## III. DISCUSSION

While Medicine Rock identifies four issues on appeal, the principal issue is whether the Commission erred in determining that Oxley qualified for unemployment benefits because Medicine Rock discharged Oxley for reasons other than employment related misconduct.

■ Under Idaho Code § 72–1366(5), a claimant is eligible for unemployment benefits if "the claimant's unemployment is not due to the fact that … he was discharged for misconduct in connection with his employment." The issue is not whether the employer had reasonable grounds for discharge, but whether the reasons constitute employment related misconduct. *Beaty v. City of Idaho Falls,* 110 Idaho 891, 719 P.2d 1151 (1986). This Court has identified three types of conduct which would fit within the definition of "misconduct" as used in I.C. § 72–1366(5): 1) a willful, intentional disregard of the employer's interest; 2) a deliberate violation of the employer's rules; or 3) a disregard of standards of behavior which the employer has a right to expect of his employees. *Campbell v. Bonneville County Brd. of Comm'rs,* 126 Idaho 222, 225, 880 P.2d 252, 255 (1994) (citing *Puckett v. Idaho Department of Corrections,* 107 Idaho 1022, 695 P.2d 407 (1985)). The tests for all three types of misconduct are factual determinations. *Campbell,* 126 Idaho at 225, 880 P.2d at 255.

### A. Standards of behavior

■ Under a "standards of behavior" analysis, Medicine Rock must demonstrate that: 1) Oxley's conduct fell below the expected standard of behavior, and 2) Mazon's expectations were objectively reasonable under the circumstances. *Bullard v. Sun Valley Aviation, Inc.,* 128 Idaho 430, 914 P.2d 564 (1996) (citing *Puckett v. Idaho Department of Cor-*

*rections,* 107 Idaho 1022, 695 P.2d 407 (1985)). Medicine Rock must also show Mazon communicated the standards of behavior. *Davis v. Howard O. Miller Co.,* 107 Idaho 1092, 1094, 695 P.2d 1231, 1233 (1984). An employer need only communicate those standards and expectations that do not flow naturally from the employment relationship. *Pimley v. Best Values, Inc.,* 132 Idaho 432, 435, 974 P.2d 78, 81 (1999) (citing *Davis,* 107 Idaho 1092, 1094, 695 P.2d 1231, 1233 (1984)). However, the mere fact of a lack of communication of behavioral standards to Oxley does not automatically make Mazons expectations unreasonable. *Appeals Examiner of Idaho Dept. of Labor v. J.R. Simplot Co.,* 131 Idaho 318, 321, 955 P.2d 1097, 1101 (1998).

### 1. *Events Prior to and Occurring on June 6, 2002.*

■ The Commission concluded Mazon could reasonably expect Oxley "would be cooperative and friendly in her dealings with him and her coworkers," but that these standards do not have universal meaning so it was incumbent upon Mazon to clearly communicate his expectations to Oxley. Practices and expectations not common within the industry and uncommunicated by the employer cannot serve as a basis for discharge. *Davis,* 107 Idaho at 1094, 695 P.2d at 1235.

While Oxley's behavior could have amounted to misconduct, prior to June 6, Mazon did not tell Oxley her behavior was unacceptable because Mazon relied on Oxley to teach him the business and feared she would quit if confronted. There is substantial and competent evidence in the record to support the Commission's findings that Mazon had a duty to communicate standards of behavior beyond mere casual comments and to hold Oxley accountable. Mazon's warning on June 6, addressed Oxley's disrespectful and uncooperative behavior for the first time and clearly informed Oxley of her duty to perform a variety of assigned tasks. Consequently, the Commission is correct that the June 6 formal warning served, not only as notice of the standards to which Oxley would be held, but also as discipline for all of Oxley's prior misconduct.

### 2. *Events After June 6, 2002.*

■ After determining that Oxley had received a sanction for her activities prior to June 6, the Commission then considered any acts of insubordination occurring after June 6, stating:

the Employer cannot 'hold in its pocket' forever the basis of such a discharge and then issue such a discharge merely at its pleasure. Employers cannot use a form of discipline short of discharge for a behavior, and then later discharge the worker for the same behavior unless the employer can demonstrate a subsequent occurrence.

Medicine Rock argues any subsequent misconduct is irrelevant and urges the Court to focus instead on the entire course of Oxley's conduct. Medicine Rock cites to the cases of *Roll v. City of Middleton,* 105 Idaho 22, 665 P.2d 721 (1983), *Harrelson v. Pine Crest Psychiatric Ctr.,* 107 Idaho 119, 686 P.2d 64 (1984), and *Weston v. Gritman Memorial Hospital,* 99 Idaho 717, 587 P.2d 1252 (1978), which hold that this Court can consider a course of conduct instead of a single event, and "there is no requirement there be a precipitating act of misconduct immediately prior to the termination." *Roll,* 105 Idaho at 26, 665 P.2d at 725. Medicine Rock reasons that Oxley's numerous acts of misconduct are sufficient to justify discharge without a precipitating event after June 6. However, in these cases the employers gave written warnings, which the employees disregarded, and the Commission focused on subsequent violations because the course of conduct included disregarding warnings.

This case is distinguishable because Mazon did not give Oxley any formal warnings prior to June 6 and Oxley did not repeatedly violate warnings. While Oxley's misconduct occurred over a long period, Mazon chose not to terminate her employment. Instead, Mazon formally warned Oxley and thereby provided her with an opportunity to improve her behavior. It follows that a subsequent act of misconduct would be necessary before Medicine Rock could discharge Oxley. Instead, when Mazon sent the next warning on June 10, 2002, he referred only to behavior occurring on June 5 and 6 for which he had already warned Oxley. Moreover, as the

Commission found, there is no evidence that Oxley even received this second warning until after she had already been terminated.

Medicine Rock argues Oxley's failure to report for work on June 10 and tardy notification amounted to a subsequent act of misconduct and justified Oxley's discharge on June 20. The Commission agreed that failing to report for work amounts to misconduct:

> Mazon was entitled to be upset when [Oxley] did not call in to tell him that she would be absent on June 10, 2002. Clearly, [Oxley] knew on June 7, 2002, that her doctor had deemed it necessary to restrict her from going to work and a prudent employee would have communicated that information to her employer that same day ... Further, the reason for the absence was written on the note by [Oxley], rather than the physician, calling into question the gaminess of [Oxley's] excuse. *This behavior alone would have justified additional inquiry and discipline, including [] discharge.* (emphasis added).

It appears Mazon could have discharged Oxley on June 10, but instead Mazon sent Oxley the second warning and did not actually discharge Oxley until June 20.

Oxley received the June 10 warning when she returned from vacation in July. When an employer warns an employee it follows that the employee should have an opportunity to improve their behavior. However, Oxley could not take advantage of any opportunity since she never returned to work after June 10. As a result, no subsequent act of misconduct occurred for which Mazon could discharge Oxley, other than her failure to report to work.

Mazon did not include Oxley's failure to report for work as a reason for discharge in the June 20 termination letter either. The June 20 termination letter again listed the same transgressions noted in the June 6 warning and additionally cited theft as a reason for discharge. Mazon never mentions Oxley's failure to report for work as a reason for discharging Oxley and therefore Mazon cannot now use failure to report for work as a reason for discharging her on the basis of misconduct.

In summary, Mazon could expect Oxley to cooperate and act respectfully, but Mazon failed to inform Oxley her behavior fell below expected standards. As a result, Mazon's formal warning on June 6 served as discipline for all of Oxley's prior transgressions. Further, while Mazon could have discharged Oxley for failing to report for work on June 10, he chose to discipline Oxley by sending a second warning, which didn't mention her failure to appear for work. Finally, Mazon terminated Oxley while she was on an authorized absence from work, before she had an opportunity to conform her conduct to Mazon's expected standards. Thus, the Commission was correct in its holding that Oxley was not terminated for employment related misconduct in failing to adhere to the employer's reasonable standards of behavior.

**B. Willful and intentional disregard for Medicine Rock's interests**

The Commission then analyzed Medicine Rock's argument that Oxley was properly discharged for a willful and intentional disregard for the employer's interests by committing theft. While the Commission acknowledged that theft "is a deliberate disregard of an employer's interest that no employer should tolerate," it found there was insufficient evidence that Oxley had indeed committed theft. To prove employee theft, the employer must establish by a preponderance of the evidence the employee stole property from the employer. *See Roll,* 105 Idaho at 25, 665 P.2d at 724; *Parker v. St. Maries Plywood,* 101 Idaho 415, 419, 614 P.2d 955, 959 (1980). A preponderance of the evidence means that when weighing all of the evidence in the record, the evidence on which the finder of fact relies is more probably true than not. *Ebert v. Newton,* 97 Idaho 418, 546 P.2d 64 (1976); *Big Butte Ranch Inc. v. Grasmick,* 91 Idaho 6, 415 P.2d 48 (1966). On appeal, this Court considers whether the Commission's conclusions are supported by substantial and competent evidence, but does not re-weigh the evidence or consider whether it would have reached a different conclusion from the evidence presented. *Hughen v. Highland Estates,* 137 Idaho 349, 350, 48 P.3d 1238, 1240 (2002) (citing *Warden v. Ida-*

*ho Timber Corp.*, 132 Idaho 454, 457, 974 P.2d 506, 509 (1999)).

The Commission concluded Mazon waited over four months to fully investigate the accusations and could not provide evidence of which items Oxley took or when the theft occurred. Accordingly, we affirm the Commission's determination that Medicine Rock did not establish by a preponderance of the evidence that Oxley stole inventory from Medicine Rock and, therefore, no employment related misconduct occurred.

## IV. CONCLUSION

Medicine Rock did not demonstrate that Oxley was discharged for employment related misconduct and, therefore, she is eligible for unemployment benefits under I.C. § 72–1366(5). The Commission's decision is affirmed.

Justices SCHROEDER, KIDWELL, EISMANN and BURDICK concur.