**Dana K. STARR, Petitioner,**

v.

**INDUSTRIAL CLAIM APPEALS OFFICE of the State of Colorado and Community Hospital Association, Respondents.**

No. 08CA2413.

Colorado Court of Appeals,
Div. VI.

Dec. 10, 2009.

Law Office of William Benjamin, William E. Benjamin, Boulder, Colorado, for Petitioner.

John W. Suthers, Attorney General, A.A. Lee Hegner, Assistant Attorney General, Denver, Colorado, for Respondent Industrial Claim Appeals Office.

Caplan and Earnest, LLC, W. Stuart Stuller, Boulder, Colorado, for Respondent Community Hospital Association.

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

Opinion by Judge ROTHENBERG.*

Petitioner, Dana K. Starr (claimant), seeks review of a final order of the Industrial Claim Appeals Office (Panel) affirming a hearing officer's decision disqualifying her from receiving unemployment benefits. We set aside the Panel's order and remand for further findings.

## I. Background

Claimant worked for twenty-six years as a data registrar for the Community Hospital Association (employer) until she was terminated for the alleged theft of the remnants of toilet paper rolls.

Several witnesses testified at the hearing, including claimant herself. She admitted taking the remains of several small end rolls of toilet paper without asking her employer's permission, but testified that she had simply removed—either from the floor or on the toilet paper shelf above the toilet paper holders—what she believed was trash, that is, discarded and dirty toilet paper remnants that were, or had been, on the floor. She explained that her purpose in doing so was to donate the otherwise unusable toilet paper remnants to a nonprofit group that sent them to the troops in Iraq for their personal use in the field.

Claimant called as a witness a friend who had informed her of the soldiers' need for small rolls of toilet paper "that they could put in their pocket to go on missions." The friend told claimant, "[T]he roll would] have to fit in a pocket, and their pockets are already pretty full. So [the soldiers had] requested small rolls of toilet paper." She testified that when she had visited the hospital where claimant was employed, she (the friend) "saw in the bathrooms small rolls of toilet paper on the floor, repeatedly." She said she had "mentioned it to [the claimant] and [the claimant] started bringing [her] a few of the tiny rolls."

The friend brought to the hearing some of the actual rolls claimant had given her and testified that they were each about one and a

§ 24–51–1105, C.R.S.2009.

half inches in diameter. She testified that before she sent a roll to Iraq, she would unroll "two or three lines just to make sure it's clean, because it's been on the floor."

The employer had five witnesses who testified by telephone, including an employer representative, a human resources manager, the manager of environmental services, and one of claimant's coworkers.

The employer's representative testified that claimant had admitted taking the remnants and had explained that "she considered it garbage." The representative stated: "We decided to discharge because the hospital has a zero tolerance policy on theft. So since [claimant] had admitted that she'd taken the toilet paper, we determined that it was theft, and so we terminated her."

However, when asked whether employer had a written policy on theft, she stated:

We don't have a written policy specifically on theft. We do have, you know, a corrective action policy that says we can [discipline] people [unintelligible] up to an[d] including termination depending on the severity of the—severity of the issue.... We have terminated people for the theft of a hard boiled egg in the cafeteria, the theft of a can of pop in the cafeteria....

The manager of environmental services testified that employer sought to reduce waste and that "the idea with this [type of coreless toilet paper roll] is so that you can use it right down to the very end." She also testified that she had seen rolls of toilet paper on the floor in the bathrooms. When asked whether employer recycled the small cores of the toilet paper rolls, she stated that her staff "probably more often would just throw them away, because they're small and they don't really collect them." She was asked if she considered "trash and even the cores of [the toilet paper rolls] to be hospital property" and she answered, "Yes. I would think—my staff would determine if they were truly trash and throw them away."

The co-worker testified that she saw claimant putting the small toilet paper rolls into a bag, and that claimant had told the co-worker "that she takes [the small end pieces of the toilet paper rolls] home and she packs them in a box" and "send[s] them to the soldiers in Iraq." The co-worker had responded, "I think our government can afford toilet paper for the soldiers." The co-worker confirmed that claimant said that "[the soldiers] really love the little ones because they can put them in their pockets" and that she "only [took] the partly used ones." According to the co-worker, when she went home and told her husband about it, he told her she was "naive and gullible" and expressed his opinion that claimant was lying. Thereafter, the co-worker accused claimant of theft and reported her to management.

Following the testimony, the hearing officer found that (1) employer bought "coreless toilet paper [for use in its building] so no waste occurs"; (2) "[t]hese toilet paper rolls can be used almost completely"; (3) claimant "admitted taking the small or end rolls of toilet paper" and "that she had done so without requesting [employer's] authorization"; and (4) claimant was terminated because employer has a "zero tolerance policy" and will terminate any employee who takes any property belonging to it.

Based on these findings, the hearing officer found claimant at fault for the separation and disqualified her from receiving benefits pursuant to section 8–73–108(5)(e)(XI), C.R.S.2009 (providing for disqualification where theft is the reason for the separation). The Panel upheld the hearing officer's decision.

## II. Standard of Review

The Panel's findings of fact may not be altered on review if supported by substantial evidence, but a decision by the Panel must be set aside if the findings of fact do not support the decision, or if the decision is erroneous as a matter of law. § 8–74–107(6), C.R.S.2009; *Nielsen v. AMI Industries, Inc.*, 759 P.2d 834, 835 (Colo.App.1988).

## III. Evidence of Value

 Claimant contends the evidence does not support the hearing officer's finding that she was discharged for "theft" because there was no specific evidence or findings regarding the *value* of the toilet paper remnants

that were taken. She maintains that the meaning of theft in section 8–73–108(5)(e)(XI) should be substantially the same as the criminal definition of theft in section 18–4–401, C.R.S.2009, including the requirement that the item taken be a "thing of value." We agree section 18–4–401 offers guidance regarding the elements of theft, but disagree that specific evidence of value is required to support a disqualification from the receipt of benefits based on theft.

Section 18–4–401(1), C.R.S.2009, provides, as relevant here:

A person commits theft when he knowingly obtains or exercises control over anything of value of another without authorization ... and ...

[i]ntends to deprive the other person permanently of the use or benefit of the thing of value; or ...

[k]nowingly uses ... the thing of value in such manner as to deprive the other person permanently of its use or benefit.

In *Jefferson County v. Kiser*, 876 P.2d 122, 123 (Colo.App.1994), it was undisputed that the claimant, who worked for the Jefferson County Sheriff's Department, had shoplifted while off duty. The dispositive issue was whether the Panel erred in determining that he was still entitled to unemployment benefits because § 8–73–108(5)(e)(XI) only contemplates theft from an employer which is committed *in the course of employment*. A division of this court concluded that the General Assembly did not intend to distinguish between theft in the course of employment and theft outside the course of employment, and therefore, that the claimant was not entitled to benefits. *Id.*

Although *Kiser* is factually distinguishable, it is instructive in determining the elements that must be shown when a theft is alleged in an unemployment compensation case as the basis for denying benefits. The division there applied a "plain and ordinary" meaning analysis in reaching its conclusion, and determined that, in the context of unemployment benefits, theft means "the act of stealing; the wrongful taking and carrying away of the personal goods or property of another; larceny." *Id.* The panel quoted the definition of theft in *Webster's Encyclopedic Unabridged*

*Dictionary of the English Language* 1470 (1989); *see* § 18–4–401(1).

Evidence of value is required in criminal theft cases because it affects the severity of the offense. *See* § 18–4–401(2)(b), C.R.S. 2009 (providing that theft is a "class 2 misdemeanor if the value of the thing involved is less than five hundred dollars"). In such cases, the value "of the thing involved" depends upon objective criteria, and the jury is not required to find the defendant was aware of the actual value of the stolen items. *See People v. Cowden,* 735 P.2d 199, 201 (Colo. 1987) (stating that the grade of theft is determined by the value of the items taken, not by the mens rea of the defendant). But this is a civil case, and we agree with the division in *Kiser* that the absence of a specific finding regarding the value of the items allegedly taken does not preclude a disqualification for theft under section 8–73–108(5)(e)(XI). *Kiser,* 876 P.2d at 123; *see also Wright v. Commonwealth,* 77 Pa.Cmwlth. 278, 465 A.2d 1075, 1077 (1983) (upholding disqualification for willful misconduct based on employee's theft of trash bags and toilet paper from employer, despite lack of evidence regarding exact amount of property taken or its value to employer and despite argument that theft was de minimis).

### IV. The Mens Rea Requirement

Nevertheless, our resolution of the value issue does not end our inquiry regarding the sufficiency of the evidence in this case. The division in *Kiser* also concluded the evidence introduced at the hearing was sufficient because it "established that claimant took the items from the store without any intention of paying for them and the hearing officer so found." *Kiser,* 876 P.2d at 123. The division thus recognized that the mens rea of a larceny must be shown.

■ Theft or larceny requires a showing that the alleged perpetrator acted knowingly and with specific intent. *See People v. Mingo,* 181 Colo. 390, 392, 509 P.2d 800, 801 (1973) ("It is generally accepted in Colorado and elsewhere that larceny requires the specific intent to permanently deprive an owner

or possessor of the property taken."); *People v. Sharp,* 104 P.3d 252, 256 (Colo.App.2004).

As the supreme court explained in *Roberts v. People,* 203 P.3d 513 (Colo.2009):

> Colorado is among the substantial majority of states that have consolidated the crimes of larceny, embezzlement, and theft under false pretenses in a single crime of theft. According to [the theft] statute, a person commits the crime of theft when he *knowingly* obtains or exercises control over anything of value of another without authorization ... *and in addition he either intends to permanently deprive the other person of its use or benefit;* demands a consideration to which he is not legally entitled to return it; or uses, conceals, or abandons it with the intent to, or at least the knowledge that his conduct will, permanently deprive the other person of its use or benefit. *See* § 18–4–401(1), C.R.S. (200[9] ). Whichever way the crime is committed, it constitutes the offense of "theft."

*Id.* at 516 (additional citations omitted; emphasis added).

■ Except with respect to the element of value, virtually every civil theft and unemployment case we have found has required proof of the same mens rea contained in the criminal statutes, although the cases have only required the civil standard of proof, a preponderance of the evidence.

For example, in *Suarez–Negrete v. Trotta,* 47 Conn.App. 517, 520–21, 705 A.2d 215, 218 (1998), the court addressed a state statute permitting a plaintiff to bring a civil action and obtain treble damages against a defendant who had stolen the plaintiff's property. The court concluded the civil action for statutory theft was "synonymous with larceny" under the state's criminal statute, stating that "statutory theft requires an intent to deprive another of his property," and therefore "requires a plaintiff to prove the additional element of intent over and above what he or she must demonstrate to prove conversion." *Id.* (quoting *Lawson v. Whitey's Frame Shop,* 42 Conn.App. 599, 605–06, 682 A.2d 1016 (1996), *aff'd in part and rev'd in part on other grounds,* 241 Conn. 678, 697 A.2d 1137 (1997)).

Florida cases have held that, to establish an action for civil theft, one must show criminal intent which is defined in Florida's criminal code as the intent to "temporarily or permanently" deprive or appropriate the property of another. The Florida Supreme Court has interpreted this section to require only the "intent to deprive," rather than the "intent to permanently deprive." *Florida Desk, Inc. v. Mitchell Int'l, Inc.,* 817 So.2d 1059, 1060 (Fla.Dist.Ct.App.2002); *see Country Manors Ass'n v. Master Antenna Systems, Inc.,* 534 So.2d 1187, 1191 (Fla.Dist.Ct.App.1988).

In *Oxley v. Medicine Rock Specialties, Inc.,* 139 Idaho 476, 481, 80 P.3d 1077, 1082 (2003), the Idaho Supreme Court concluded there was insufficient evidence of employee theft in an unemployment compensation case, and stated: "To prove employee theft, the employer must establish by a preponderance of the evidence the employee stole property from the employer."

Similarly, in *Shively v. Gatson,* 185 W.Va. 660, 662, 408 S.E.2d 610, 612 (1991), the court rejected the claimant's argument that the employer had failed to prove she actually "took and carried away" money, "an element necessary to the proof of the crime of larceny." In reaching its conclusion, the court relied on *State v. Houdeyshell,* 174 W.Va. 688, 329 S.E.2d 53 (1985), a criminal case describing the elements of larceny. The court in *Shively* concluded the evidence was sufficient to support a finding that "claimant had stolen money from customers of the employer" and that her failure to pay them was not "an honest error." 185 W.Va. at 663–64, 408 S.E.2d at 613–14.

Likewise, in *Texas Employment Commission v. Ryan,* 481 S.W.2d 172, 175 (Tex.Civ.App.1972), an employee was fired for taking home company property, namely an oxygen bottle. The court stated:

> [The employee] took the oxygen bottle and used oxygen from it for his own purposes without permission from anyone having authority to grant him that favor. The Company's posted rules, which were read to employees when hired, prohibited employees from purloining company property.

The implication of the Commission's conclusion that the claimant was "subject to disqualification under the provisions of Sec. 5(b) of the Act" is that the Commission was satisfied from the evidence presented to it that [the employee] appropriated the Company's property by theft. *The elements of theft, as that offense is defined in Texas Penal Code, Article 1410,* were proven by evidence the Commission apparently accepted as true. Evidence tending to show a lack of criminal intent and mitigating the seriousness of [the employee's] conduct appears to have been rejected by the Commission in deciding the company rule was breached....

*Id.* (emphasis added).

In *O'Keefe v. Commonwealth,* 18 Pa. Cmwlth. 151, 156, 333 A.2d 815, 818 (1975), the issue was whether a claimant who admitted taking stale pastries from his employer on several occasions had committed theft or "willful misconduct" and was ineligible for unemployment compensation. The court concluded he did not commit theft, stating:

O'Keefe made no attempt to conceal his actions, since both he, the other employees, and their immediate supervisor believed that the stale pastries were valueless waste material.

. . . .

[W]hile we do not condone theft by an employee, we simply cannot agree with the Board that this case shows any improper motive on the part of O'Keefe. In the peculiar circumstances of this case, we can find no indication of any wrongful conduct on O'Keefe's part. Indeed, it is difficult for us to see how O'Keefe can be said to have disregarded a "standard of behavior" when the record shows, without contradiction, that none of the other employees, or the immediate representative of management, had the slightest idea that anything was wrong with eating a piece of stale, apparently unsalable, pastry.

We note that O'Keefe ... "admitted" that he knew eating the pastries was wrong.... [He] offer[ed] to make restitution in the amount of $50 (to cover all of the pastries consumed by O'Keefe over a period of several months), and, in fact,

O'Keefe did pay [the employer] $50. From this, the Board found that O'Keefe had been "stealing baked goods" from his employer. The entire balance of the record leaves us with no doubt that *O'Keefe was not "stealing" as we understand the meaning of that term,* and the statement containing the "admission" (which is the only evidence indicating O'Keefe knew his actions were disapproved of by his employer) does not constitute the substantial evidence necessary to support the finding of the Board.

18 Pa. Cmwlth. at 155–57, 333 A.2d at 818–19 (emphasis added).

*Kiser* is the only published opinion in Colorado addressing the issue of employee theft under section 8–73–108(5)(e)(XI). But *Itin v. Ungar,* 17 P.3d 129 (Colo.2000), offers guidance. There, the supreme court addressed section 18–4–405, C.R.S.2009, the rights in stolen property statute, which provides a civil remedy to those who have had their property taken as the result of "theft, robbery, or burglary." The supreme court applied the definition of theft in the criminal theft statute, reasoning that the civil statute did not define "theft, robbery, or burglary" and that the "Rights in Stolen Property statute appears in the Criminal Code." 17 P.3d at 133.

The court explained that under the civil statute, "a plaintiff must prove the defendant took the property by theft, robbery, or burglary and not conversion," and further explained the difference between conversion and theft:

[Common-law conversion] is distinct from the crime of theft in that it does not require that a wrongdoer act with the specific intent to permanently deprive the owner of his property. In other words, a good faith purchaser who acts without the knowledge that property has been stolen may be liable for conversion, but may not possess the specific intent to permanently deprive and thus may not be liable for a crime of theft.

*Id.* at 135–36 nn. 10 & 12; *see Harris Group, Inc. v. Robinson,* 209 P.3d 1188, 1199 (Colo. App.2009) ("[T]he tort [of conversion] does not require that a tortfeasor act with the

**1062**

specific intent to permanently deprive the owner of his or her property.").

The court in *Itin* did not reach the issue of the burden of proof, but it noted "that a majority of federal circuits have adopted a preponderance of the evidence standard of proof in [Racketeer Influenced and Corrupt Organizations Act] actions, which also provide civil remedies based on violations of criminal offenses," and that "the [United States] Supreme Court, while not expressly reaching this issue, appears to approve of the preponderance of evidence standard." 17 P.3d at 136 n. 12 (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 491, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)); *see also Huffman v. Westmoreland Coal Co.*, 205 P.3d 501, 509 (Colo.App.2009).

The only published decision we have found that has applied a different analysis in an employee theft case is *Scott v. Scott Paper Co.*, 280 Ala. 486, 195 So.2d 540 (1967), *reversing* 43 Ala.App. 532, 195 So.2d 536 (1966).

The claimant there was fired for "industrial misconduct" and filed a claim for unemployment benefits. At issue was whether his benefits should be denied because he was discharged for a dishonest act committed in connection with his work, specifically, the removal of company property without authorization. The facts were largely undisputed and described in the court of appeals decision:

The claimant had a package of finished paper wrapped in some clothing in his possession when he was intercepted by a plant guard as he left the employer's premises through the main office. The plant guards had been alerted as it was suspected that some employees were removing paper from the premises without proper authorization. The claimant informed a company official that he had removed the paper from a trash container and had no intention of stealing company property. The main office was used as an exit from the plant but was not used by the production employees unless authorization had been issued. The claimant's reason for leaving through the office on the last day of employment was to go to a credit union office which was located in that vicinity. The package of paper was examined and found to contain letter size white bond. The paper was wrapped. However, the label had been removed.

43 Ala.App. at 533–34, 195 So.2d at 537–38.

The referee denied the claimant unemployment benefits, finding that he had possession of a finished and wrapped product which he had concealed by wrapping it in some clothes; that he "did deliberately remove company property from the employer's premises without proper authorization"; and that this constituted "a dishonest act within the meaning of ... Alabama Law." *Id.* at 534, 195 So.2d at 538.

The court of appeals disagreed, stating that "the evidence ... while suspicious, would not have sufficed to let a criminal case go to a jury on a charge of embezzlement. This is because of failure to prove reasonable market value. In a case of taking property or other things of value, we construe dishonest and criminal as synonymous." *Id.* at 535, 195 So.2d at 539 (citation and footnote omitted).

However, the Alabama Supreme Court reinstated the hearing officer's decision, reasoning as follows:

[T]he judgment was reversed because the evidence did not meet the technical requirements for a conviction of the crimes of larceny or embezzlement. The court [of appeals] said: "In a case of taking property or other things of value, we construe dishonest and criminal as synonymous." It is with this statement that we find ourselves in disagreement.

There is no question but that an employee can be disqualified for benefits if he was discharged because of a criminal act committed in connection with his work. But we cannot say that the Legislature intended that all dischargeable acts must amount to a violation of the criminal law. If such were the case, there would have been no need to add the word "dishonest." ...

There are many acts which constitute fraud that are actionable at both law and equity which do not amount to violations of the criminal law....

We cannot agree that the Legislature intended that every time company property was found in the unauthorized possession of an employee, and there was proof that the possession was dishonest and unauthorized, the proof was to no avail unless it also was sufficient to support a conviction for larceny or embezzlement.

Here, the employee was discovered with a package of finished bond paper concealed in his clothing as he was leaving the plant. His explanation was not plausible and his conduct was in conflict with company rules. We think ... there was sufficient evidence to classify his action as a dishonest act committed in connection with his work. We do not construe ' "dishonest" and "criminal," as used in the statute, as synonymous, either generally or in connection with the unauthorized possession of company property.

280 Ala. at 486–88, 195 So.2d at 541–42.

We perceive no conflict between *Scott* and *Kiser* for several reasons. First, the *Kiser* division held, as did *Scott,* that evidence of value is not an essential element and need not be shown where the disqualification from employment benefits is based on an employee's theft. Second, in *Kiser, Scott,* and virtually every published opinion we have found where the employee's discharge was based on theft, the courts have required proof that the employees accused of theft had acted intentionally, or at least knowingly and deliberately. In *Scott,* the referee found the claimant "*deliberately* remove[d] company property from the employer's premises without proper authorization." 43 Ala.App. at 533–34, 195 So.2d at 537–38 (emphasis added). A similar mens rea also has been required when the reason for the discharge was characterized as "willful misconduct" rather than theft. *See Gane v. Comm'n,* 41 Pa. Cmwlth. 292, 293, 398 A.2d 1110, 1111 (1979) (the claimant's admission that he deliberately falsified his weekly remittance slips to his employer was sufficient to constitute "willful misconduct").

Two important but sometimes countervailing policies are involved in cases such as this one. On the one hand, employers must have the ability to protect themselves from employee theft and other forms of dishonesty, particularly where the employees handle cash. On the other hand, an allegation of theft has very serious consequences for an employee, whether or not criminal charges are filed. Even if the allegation is later shown to be unfounded, it may well affect the ability of the employee to earn a livelihood.

Indeed, Illinois not only looks to its criminal statutes for guidance but also has a specific statute providing that a disqualification from receiving unemployment insurance benefits "may not be imposed unless the employee has either admitted his commission of the felony or theft or has been convicted of the offense by a court of competent jurisdiction" and "in the case of a discharge based on job-related theft, [the statute] requires a showing that the employer was in no way responsible for the theft." *Cetnar v. Bernardi,* 145 Ill. App.3d 511, 514, 99 Ill.Dec. 393, 495 N.E.2d 1128, 1131 (1986) (applying former codification of 820 Ill. Comp. Stat. 405/602(B) ).

We are persuaded by the reasoning of *Kiser* and the numerous other cases that have concluded that, while evidence of the value of the item allegedly stolen by an employee is not required in unemployment cases, where a theft is alleged as the basis for disqualification of unemployment benefits, the employer must establish by a preponderance of the evidence the mens rea required in theft or larceny cases.

## V. Defenses to an Allegation of Theft

In *Miller v. People,* 4 Colo. 182, 183 (1878), the Colorado Supreme Court recognized that "[n]ot every wrongful taking of property with intent to convert the same to one's own use is larceny. If the *animus furandi* is wanting, the act is not larcenous...." Hence, a mistake of fact will relieve an individual of liability for theft if it negates the existence of that mental state. *See* § 18–1–504(1)(a), C.R.S.2009.

In *People v. Bornman,* 953 P.2d 952, 954 (Colo.App.1997), the defendant was convicted of theft of more than $400. But there was evidence he had been given the vehicle he was charged with stealing by a friend in satisfaction of an alleged lien. When con-

fronted by the true owner, the defendant insisted that his exercise of control over the vehicle was the result of a "big misunderstanding." *Id.*

Defense counsel requested that the jury be instructed that, to be found guilty, the defendant must have been aware his exercise of control over the vehicle was not authorized. The trial court refused the instruction, concluding that the "knowingly" state of mind was to be based on an objective, reasonable person standard. *Id.*

A division of this court reversed the judgment and ordered a new trial. The division held that if the defendant had entertained a good faith belief he was entitled to take the item in question, he would not have been guilty of theft:

> Both the wording of § 18–4–401(1) and the explicit provisions of § 18–1–504(1)(a), C.R.S. [2009] (mistake of fact relieves from criminal liability if it "negatives the existence of a particular mental state essential to commission of the offense"), make it clear that, if defendant entertained a good faith belief that he was entitled to take the vehicle, he was not guilty of theft. To apply an objective standard in such circumstances would be to authorize a conviction of theft based upon simple negligence. ... [I]t was reversible error to give the elemental instruction in the above form and to prohibit counsel from arguing that defendant possessed the honest, good faith belief that he had the requisite authority, irrespective of the belief that a reasonable person might have formed under the same circumstances.

*Bornman*, 953 P.2d at 954 (citation omitted); *cf. People v. Johnson*, 193 Colo. 199, 200, 564 P.2d 116, 118 (1977) ("The standard of culpability [of a defendant charged with felony by theft] must be what the state of mind of the particular defendant was, not what a jury concludes might be that of a fictional reasonably prudent man."); *State v. Cales*, 95 Conn.App. 533, 897 A.2d 657, 661 (2006) (approving jury instructions providing that if a person took property honestly, although mistakenly believing that he had the right to do so or that the property was abandoned, the requisite intent for larceny would be lacking);

*Summers v. Gatson*, 205 W.Va. 198, 203, 517 S.E.2d 295, 300 (1999) (awarding the claimant employment benefits after concluding he did not commit theft or larceny because he took a coin he believed had been abandoned).

## VI. Application to this Case

In this case, the hearing officer apparently credited claimant's testimony because he found that she "did not speak with the EVS manager and request permission to take that toilet paper" because "[she] perceived the rolls of toilet paper she was taking as trash and not sufficient to be used." However, after defining theft as "the wrongful taking and carrying away of the personal goods or property of another," the hearing officer concluded:

> The claimant clearly was taking at least end rolls of toilet paper without permission. [She] never did request permission in spite of the fact that she believed she was performing a good deed by sending these remaining unused portion[s] of rolls of toilet paper to the troops in Iraq. *Clearly in such a situation it would be reasonable to request permission to use these items for this purpose.* The claimant failed to do so. Under these circumstances the separation was the result of volitional acts and omissions. The claimant is not entitled to benefits.

(Emphasis added.)

■ We conclude that *Bornman* is dispositive of this issue, and that the hearing officer erred as a matter of law in applying a reasonable person standard to assess claimant's mens rea. The outcome should not have been determined based on what a reasonable person might have believed or what actions a reasonable person would have taken. It should have been made based on whether *this claimant* had a good faith but mistaken belief the end pieces of the toilet paper rolls that she took had been discarded or abandoned by employer. If so, she is entitled to benefits. *Johnson*, 193 Colo. at 200, 564 P.2d at 118; *Bornman*, 953 P.2d at 954; *Cales*, 897 A.2d at 661; *Summers*, 205 W.Va. at 203, 517 S.E.2d at 300.

In reaching our conclusion, we recognize that the hearing officer also found that "the [claimant's] separation was the result of volitional acts and omissions." However, we conclude additional and specific findings regarding claimant's mens rea are required.

In *City & County of Denver v. Industrial Commission,* 756 P.2d 373 (Colo.1988), the supreme court discussed the word "volitional." There, the claimant admitted she was discharged after repeatedly appearing for work in an intoxicated condition, but contended she was eligible for unemployment benefits. The court stated:

> When a claimant's alcoholism has advanced to the stage that the alcoholic is unable to abstain from drinking, the claimant's conduct may be considered nonvolitional and disqualification from benefits is not required. In contrast, when a claimant's alcoholism is such that the alcoholic is *able to choose or decide* whether to drink alcoholic beverages, the act of drinking is characterized as volitional. Because fault under the statute requires "a volitional act," this misconduct constitutes fault. The degree of impairment and the volitional or nonvolitional nature of a claimant's alcoholism can only be determined under the particular facts of each case. "At a minimum, *the claimant must have performed some volitional act or have exercised some control over the circumstance* resulting in the discharge from employment." *Gonzales v. Industrial Comm'n,* 740 P.2d 999, 1003 (Colo.1987) (applying § 8–73–108(5)(e)(XX) to a claimant who was terminated for violating the employer's disciplinary guidelines).

756 P.2d at 378–79 (additional citation omitted; emphasis added).

The ability of a claimant to exercise control or to make a voluntary choice was also discussed in *Cole v. Industrial Claim Appeals Office,* 964 P.2d 617 (Colo.App.1998), in its discussion of volitional behavior. There, the claimant quit her job because of her own and her children's health problems, but she was denied unemployment benefits because her resignation was found to be volitional. A division of this court addressed the meaning of "volitional" in this context and stated:

> Under the unemployment scheme, "fault" is a term of art which is used as a factor to determine whether the claimant or the employer is responsible overall for the separation from employment. In this context, "fault" has been defined as requiring *a volitional act or the exercise of some control or choice by the claimant* in the circumstances resulting in the separation such that the claimant can be said to be responsible for the separation.

> We also note that the determination of whether a claimant was responsible or "at fault" for his or her separation from employment is not a question of evidentiary fact, but rather is an ultimate legal conclusion to be based on the established findings of evidentiary fact.

> Here, although it is undisputed that various health problems motivated claimant's decision to quit, it is also clear that her separation from this employment resulted when she chose to resign. Thus, while claimant's health concerns may have provided her with subjectively compelling personal reasons for quitting this employment, she could not be entitled to an award of benefits on a "no fault" basis unless she established that her *separation was essentially involuntary* under the objective circumstances shown, notwithstanding her resignation. *Cf. Goddard v. EG & G Rocky Flats, Inc.,* 888 P.2d 369 (Colo.App. 1994) (quitting in the face of an otherwise imminent involuntary termination was *not* a separation from employment by claimant's volitional choice, and disqualification therefore unwarranted).

*Id.* at 618–19 (emphasis added).

Decisions in other jurisdictions in both civil and criminal cases have generally used the term "acted volitionally" to mean the individual acted voluntarily, consciously, and not accidentally. *See Brice v. City of York,* 528 F.Supp.2d 504, 512–13 (M.D.Pa.2007) (upholding the dismissal of an excessive force claim against a police officer who accidentally discharged his weapon while arresting the plaintiff; court concluded the officer's act was not volitional); *Partee v. State,* 121 Md. App. 237, 260, 708 A.2d 1113, 1125 (1998) ("[T]he nature and location of appellant's

wounds and his physical response to being shot ... precluded an assumption essential to any inference that appellant *acted volitionally: that he possessed the degree of physical control over his body necessary to act wilfully* to dispose of the pouch." (emphasis added) ); *State v. Wendler,* 312 Minn. 432, 434, 252 N.W.2d 266, 267–68 (1977) (upholding the trial court's finding that defendant was not insane because he "was cognitive of his actions, *acted volitionally, and had the capacity to control his behavior"* (emphasis added) ); *McGanty v. Staudenraus,* 321 Or. 532, 550, 901 P.2d 841, 852 (1995) (observing that the "Restatement (Second) of Torts § 8A (1965) defines the element of 'intent,' with respect to intentional torts" "to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it"); *State v. Warren,* 168 Or.App. 1, 5, 5 P.3d 1115, 1117 (2000) ("The statute [permitting consecutive sentences] focuses on a defendant's *volition or the exercise of his or her will* at the time of the commission of the crimes.... The statute requires more than an incidental violation ...." (emphasis added) ); *Commonwealth v. Zacher,* 455 Pa.Super. 594, 599, 689 A.2d 267, 269 (1997) (concluding there was insufficient evidence of defense attorney's tardiness on date of trial to find him in contempt and finding that he acted volitionally because "[t]here is no evidence that [he] *consciously and deliberately* failed to appear for court," where "the surrounding circumstances tend to prove that. [he] 'lost track of time' and was late for court inadvertently," which] "is not the equivalent of intent").

■ Thus, while the terms "intentionally," "knowingly," and "volitionally" sometimes overlap, they are not synonymous. When used in this context, acting with "volition" generally means having the power or ability "to choose and decide" or to exercise "some control over the circumstances," as opposed to acting in a manner that is "essentially involuntary" or accidental. *See Ward v. Industrial Claim Appeals Office,* 916 P.2d 605, 607 (Colo.App.1995) (rejecting claimant's contention that his resignation was involuntary because of stress "which caused him to lose control of the situation and his surround-

ings," and concluding there was record support for the finding that he "acted volitionally in resigning"); *Nielsen v. AMI Industries, Inc.,* 759 P.2d at 835 ("If the unwritten policy was never communicated to the claimant, the claimant could not be aware that he had a choice on how to proceed, and thus could not act volitionally.").

In contrast, actions taken "intentionally" or "knowingly" are made purposefully and with design. Former Chief Justice Quinn explained the statutory requirements of acting "intentionally" and "knowingly" in his dissent in *People v. R.V.,* 635 P.2d 892, 896 (Colo.1981):

Acting "knowingly" with respect to conduct or circumstance requires an awareness that one's conduct is of such a nature or that a particular circumstance exists and, in the case of result, an awareness that one's conduct is practically certain to cause the result. Section 18–1–501(6), C.R.S. [2009]. As defined in section 18–1–501(6) ... "knowingly" is both qualitatively distinct from and less culpable than the mens rea of "intentionally." "A person acts 'intentionally' or 'with intent' when his conscious objective is to cause the result proscribed by the statute defining the offense." Section 18–1–501(5), C.R.S. [2009].

Claimant here does not contend her actions were involuntary or coerced. She contends she acted based on a good faith, but mistaken, belief that the items she was taking had been abandoned or discarded. Hence, the hearing officer's finding that her "separation was the result of volitional acts and omissions" does not necessarily mean she acted with the knowledge and intent required to commit theft. *See Phelps Tointon, Inc. v. Division of Employment & Training,* 824 P.2d 827, 829 (Colo.App.1991) (concluding a remand was required because the hearing officer's error affected the conclusion reached). It is also unclear what the hearing officer meant by claimant's "omissions" because a negligent act or omission would be insufficient to prove theft. *See Spaulding v. Florida Industrial Comm'n,* 154 So.2d 334, 338 (Fla.Dist.Ct.App.1963) (holding that an employee's inadvertence, ordinary negli-

gence, poor judgment, or inattention does not constitute misconduct).

Therefore, we conclude further findings are required regarding claimant's mens rea at the time of the incidents that gave rise to her discharge from employment.

## VII. Violation of Company Rule

■ We reject employer's argument that disqualification is appropriate under section 8–73–108(5)(e)(VII), C.R.S.2009. That section permits disqualification, as relevant here, if there is evidence that claimant engaged in the

> [v]iolation of a statute or of a company rule which resulted or could have resulted in serious damage to the employer's property or interests or could have endangered the life of the worker or other persons, such as: Mistreatment of patients in a hospital or nursing home; serving liquor to minors; selling prescription items without prescriptions from licensed doctors; immoral conduct which has an effect on worker's job status; divulging of confidential information which resulted or could have resulted in damage to the employer's interests; failure to observe conspicuously posted safety rules; intentional falsification of expense accounts, inventories, or other records or reports whether or not substantial harm or injury was incurred; or removal or attempted removal of employer's prop-

erty from the premises of the employer without proper authority.

Here, there is no evidence in the record that claimant's actions "resulted or could have resulted in serious damage to the employer's property or interests or could have endangered the life of the worker or other persons."

The Panel's order is set aside and the case is remanded to the Panel with instructions to remand the case to the hearing officer. On remand, the hearing officer shall determine, based on the evidence in the record, whether claimant had a good faith but mistaken belief the toilet paper remnants she took had been discarded or abandoned by employer. If so, the hearing officer shall award her benefits. If the hearing officer determines that claimant not only acted volitionally, but also had the requisite knowledge and intent to deprive her employer of its property at the time of the actions alleged in this case, she is not entitled to benefits.

Judge HAWTHORNE and Judge TERRY concur.